**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark A. Gonzales, an individual, | No. CV-15-00064-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Det. Cameron Douglas (Badge No. 1351), in his individual capacity as a detective with the Scottsdale Police Department, | |
| Defendant. | |

Scottsdale Police Detective Cameron Douglas threw a flash-bang grenade near a house during the execution of a search warrant. Mark Gonzales was injured and claims Douglas used excessive force. As evidence, Gonzales offers an eyewitness account of the incident and an expert's opinions on Douglas's conduct.

Douglas moves to exclude the eyewitness account on the ground that it was not disclosed during discovery. (Doc. 92 at 2–6; Doc. 98 at 1 n.2.) He also moves for summary judgment based on qualified immunity. (Doc. 72.) Finally, he moves to strike the expert opinions as irrelevant and unreliable. (Doc. 83.)

For the reasons that follow, (1) the motion to exclude the eyewitness account will be denied, (2) the motion for summary judgment will be denied, and (3) the motion to strike the expert opinions will be granted.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   UNDISPUTED MATERIAL FACTS

The following facts are distilled from the parties' lengthy statements of facts and accompanying exhibits.  (Docs. 73, 74, 90, 99, 104, 106.)  Unless otherwise indicated, these facts are undisputed.  All evidence relevant to Douglas's summary judgment motion is viewed in the light most favorable to Gonzales.

### A.   Events preceding execution of search warrant

In 2013, the City of Scottsdale experienced a dramatic increase in thefts at local grocery stores.  The thefts followed a pattern: one or more individuals would enter the store with reusable shopping bags, fill the bags with dozens of cans of baby formula, leave without paying, and escape in a nearby getaway car.  Police started investigating.

In October 2013, police arrested one such thief as he exited a store.  The thief revealed that he was working for a man named Tyler Hanesford.  According to the thief, Hanesford trained him to steal, told him which stores to hit, and paid him $125 per bag of stolen formula.  The police learned that Hanesford was paying several thieves and was selling the stolen formula to another buyer.  Police then arrested another thief, who corroborated this account.

That month, police began to surveil Hanesford's house.  They saw several known thieves come and go.  In a nearby trash bin, they found a ripped reusable shopping bag and evidence of illegal drug use.

On December 29, 2013, police received calls about a drive-by shooting at Hanesford's house during a party at 3:00 a.m.  Hanesford was one of the callers.  Officers arrived and asked Hanesford whether anyone was injured and whether he knew who fired the shots.  According to the police report, Hanesford was "uncooperative" and "would not answer any questions."  (Doc. 74-19 at 50.)  Police found spent shell casings in the front yard.

On January 5, 2014, police searched Hanesford's house at midnight on suspicion of underage drinking at a party. Hanesford was not present at the time. Nineteen minors were found to have consumed alcohol, and up to fifteen other individuals fled the scene by jumping the backyard wall. Police found a handgun hidden in a vent in Hanesford's bedroom. As a convicted felon, Hanesford could not lawfully possess a gun.[1] Police also found a large knife in that room. In other rooms, police found ammunition for the gun and evidence of heroin use. In a shed in the backyard, police found one of the house residents crouched next to a handgun and several cans of baby formula. The resident was also a convicted felon who could not lawfully possess a gun. Police arrested the resident and seized the guns, ammunition, and knife.

On January 7, 2014, police followed a white car from Hanesford's house to a local grocery store. Hanesford was not in the car. The occupants of the car entered the store, stole $1000 of formula, and drove away. Police followed the car to two more grocery stores and observed similar thefts. Police then followed the car back to Hanesford's house and saw it drive into the backyard through a gate on the east side of the property.

That evening, police set up surveillance in an unmarked van near the house. At around midnight, Hanesford came out of the house and began banging on the driver's side window, yelling "Who the f--- are you? Why are you parked here?" (Doc. 74-10 at 13.) He tried to look inside the van with his cell phone flashlight. Then he got into a black car, drove up to the van, and turned on his high beam headlights. He returned to the van and resumed banging on the window, yelling "I knew it! Undercover cop! Get the f--- out of here!" (*Id.*) He then returned to his car, and the police drove away.

On January 9, 2014, police again followed the white car from Hanesford's house to three different grocery stores. As before, the occupants stole thousands of dollars of formula and drove the loaded car to Hanesford's backyard through the east gate.

---

[1] Years prior, Hanesford had pled guilty to possession of burglary tools, a class 6 felony. (Doc. 74-16 at 12.)

- 3 -

On January 16, 2014, police again followed the white car from Hanesford's house to three different grocery stores and watched the occupants steal formula.  This time, police arrested the thieves as they exited the third store.  The thieves confirmed that Hanesford taught them how to steal formula, was paying them for it, and was selling it to another buyer.

That day, the police obtained a warrant to search Hanesford's house.  (Doc. 74-16 at 2–16.)  The warrant authorized police to seize evidence of illegal drug use, evidence of baby-formula stealing, and firearms or other deadly weapons.  The search was to occur "in the daytime," meaning before 10:00 p.m.  (*Id.* at 5.)

Later that day, Scottsdale Police Detective Nicholas Alamshaw designed an "operations plan" for the warrant's execution.  (Doc. 74-19 at 2–19; Doc. 73-16 at 2–9.)  In designing the plan, Alamshaw kept in mind circumstantial factors relevant to officer safety.  Alamshaw knew about the recent drive-by shooting at Hanesford's house.  (Doc. 73-16 at 5.)  He knew about the recent search of Hanesford's house during an underage drinking party, where several people fled the scene and where police found a handgun and large knife.  (*Id.* at 3–4.)  He knew that Hanesford recently banged on an undercover police surveillance van outside the house.  (*Id.* at 6–7.)  He also had information that Hanesford owned a pit bull and had previously been arrested for assault, burglary, and drug charges.  (*Id.* at 7–8.)  However, aside from the encounter with the undercover police van, Alamshaw had no information that Hanesford or any of his associates ever acted violently toward police.  (*Id.* at 3–9.)

The operations plan called for three teams of officers.  An eleven-member "entry" team would knock on the house's south-facing front door, announce police presence, and enter and secure the house.  A seven-member "backyard" team would enter through the south-facing gate on the east side of the property, secure the backyard, and enter the house's east-facing door.   An "outer perimeter" team would be stationed in the surrounding area to stop anyone fleeing the scene.  Some officers would be armed with

flash-bang grenades, or "flash bangs."[2]  The flash bangs were designed to detonate 1.5 to 3 seconds after being thrown.  The officers had been trained to always look before throwing a flash bang.  The plan authorized officers to use flash bangs at their discretion.

That evening, at approximately 7:00 p.m., all participating officers were briefed on the circumstances of the search warrant and their respective assignments.  Then the officers donned their tactical gear, loaded onto armored vehicles, and drove to Hanesford's house.

### B.     Execution of search warrant

At approximately 8:00 p.m., the entry team and backyard team approached Hanesford's house from the south in armored vehicles.  The vehicles used loud diesel engines.  As the teams exited the vehicles and walked northward, someone inside the house peeked out a window and then retreated.  Upon seeing this, the officer leading the entry team yelled "Compromise!" to alert the teams they had been spotted.

At the compromise alert, both teams sprang into action.  The entry team breached the house's front door and arrested the occupants.  There is conflicting evidence as to the entry team's conduct (*compare* Doc. 73, ¶¶ 91–95 *with* Doc. 90 at 33–35), but that conduct is not at issue here.

There is also conflicting evidence as to the backyard team's actions.  Everyone agrees that (1) Scottsdale Police Sergeant Nathan Mullins threw a flash bang, (2) Douglas threw a second one, (3) one of the flash bangs injured Gonzales, and (4) despite his injury, Gonzales jumped the backyard wall and fled.  (Doc. 73, ¶¶ 107–09, 120–21, 134; Doc. 90 at 40, 45–48, 55.)  But as to details, witnesses offer inconsistent accounts.

---

[2] "The flash-bang grenade is a light/sound diversionary device designed to emit a brilliant light and loud noise upon detonation.  Its purpose is to stun, disorient, and temporarily blind its targets, creating a window of time in which police officers can safely enter and secure a potentially dangerous area." *Boyd v. Benton Cty.*, 374 F.3d 773, 776 (9th Cir. 2004).  It goes by "a variety of names, including 'flash grenade,' 'stun grenade,' 'concussion grenade,' 'distraction device,' and the colloquial 'flashbang.'" *Terebesi v. Torreso*, 764 F.3d 217, 225 n.4 (2d Cir. 2014).

Mullins testifies as follows. (Doc. 73-22 at 2–3; Doc. 73-23 at 2–23.) Upon hearing the compromise alert, Mullins feared that residents of the house might ambush the officers or flee through the house's east side door. Accordingly, he walked up to the east gate and peered through the slats. He saw the east side door was open and light was shining out. He also saw a car parked about ten feet north of the gate, facing northward, near the door. Due to the light from the house, Mullins could see that there was no one between him and the car. He threw a flash bang over the gate toward the passenger's side rear corner of the car, to distract the residents and dissuade anyone from leaving the house. As soon as he threw the flash bang, another officer began opening the gate, preventing Mullins from seeing where his flash bang detonated. Sometime after the gate was opened, Douglas threw a flash bang. Mullins did not see where that flash bang landed or whether anyone was standing in its path. After both flash bangs detonated, the team secured the backyard. Mullins never saw anyone in the backyard.

Douglas's testimony is less detailed but generally consistent with Mullins's. (Doc. 73-12 at 2; Doc. 73-13 at 2–31.) Douglas says that sometime after the gate was opened, he threw a flash bang north of the backyard team's position. The reason he threw the flash bang was to distract residents and reduce the risk of ambush. Douglas does not remember details, such as how far he threw the flash bang, when he threw it, where he was when he threw it, or what the lighting conditions were. However, he is confident that he had a clear view of the backyard and did not see anyone there at any time.

Gonzales's testimony suggests that he was injured by the first flash bang. (Doc. 74-13 at 39–60.) Before police arrived, Gonzales was in Hanesford's house playing video games and smoking marijuana. Suddenly Gonzales heard a loud screech of tires outside. Having been at Hanesford's house during the recent drive-by shooting, Gonzales's first thought was to run for his life:

> I honestly thought I was going to die. I thought they were going to make good on their promise and come back and kill us. I mean, they had already shot the house so I had no

reason to think otherwise.  So my first thought was to leave, to get out of there and get to safety.

(*Id.* at 49.)  Accordingly, Gonzales ran to the east side door and opened it.  His memory of what happened next is fuzzy, but he says that after he stepped outside he saw something in his peripheral vision and felt an explosion:

> I ran to the door.  I immediately opened the door.  And this is where it gets all fuzzy; it's hard to recall.  But right as soon as I hit the door, I remember stepping out and seeing something in my peripheral.  It's, like, a little black -- I can't really -- I can't -- you know -- but I wasn't, like, paying attention at the time because I was scared and I was trying to just get out of there.  So after that, that's when, bang, just a loud bang, and I kind of felt something different but I didn't know what it was at first because of my adrenaline rush was pumping and I just wanted to get to safety . . . .

(*Id.* at 48.)  He estimates the explosion occurred only seconds after he opened the door:

> Maybe, like, a second or two in between, maybe like three seconds, but it was like -- I mean, to me it's really hard because of what happened, but it's really fuzzy, yes.

(*Id.* at 49.)  The explosion caused a tingling sensation in his leg:

> I felt something, like, off and my leg was different.  It was, like -- I can't explain it.  It just felt off.  It wasn't right, I knew it, and it was, like, a little tingly, but my adrenaline was pumping so I really couldn't feel it.

(*Id.* at 50.)  Gonzales did not hear any comparable loud noise before that explosion.  (*Id.* at 53.)  Nor did he hear noise afterward, as the explosion deafened him.  (*Id.* at 53–54.)  After the explosion, he immediately jumped the backyard wall and ran away.  (*Id.* at 50.)

An eyewitness, Colton Gardner, tells a different story.  (Doc. 89-1 at 4–9.)  Gardner was with Gonzales at Hanesford's house.  Unlike Gonzales, Gardner did not smoke marijuana.  (Doc. 74-13 at 47.)  Gardner says that while playing video games, he "noticed something outside caught [Gonzales's] attention."  (Doc. 89-1 at 5, ¶ 6.)  They looked out the window but did not see anything, so they went out the east side door to get a better view.  Gardner then walked south toward the gate.  While standing near the

- 7 -

parked car and looking at the gate, Gardner saw silhouettes and heard voices.  Then, after being outside for "about 45 seconds," he heard "the first loud bang" somewhere behind him.  (*Id.*, ¶¶ 9–10.)  Although he did not see the explosion, he believes it happened near the rear driver's side of the car.  Disoriented, he turned back toward the door in Gonzales's direction.  He then saw a "second explosion occur in the area of where [Gonzales] was standing," which was "between the driver's door of the car and the door to the house."  (*Id.* at 6, ¶ 12.)  The second explosion temporarily blinded Gardner, so he did not see where Gonzales went.  He then returned to the house, where he was arrested.

No one else witnessed the moment of Gonzales's injury.  After fleeing the scene, Gonzales was stopped by police and taken to the hospital, where his leg was treated for serious burns.  A photograph taken at the hospital shows the extent and location of the burns.  (Doc. 90 at 47–48.)

The parties offer photographs of the scene in an effort to show where the flash bangs detonated.  (*See* Doc. 74-17 at 4, 6; Doc. 90 at 47; Doc. 99 at 44–45; Doc. 99-1 at 33.)  But the parties have not demonstrated the reliability or significance of these photographs.  Because the Court views the evidence in the light most favorable to Gonzales, the Court does not consider these photographs for purposes of summary judgment.

### C.    Present lawsuit and discovery dispute

Gonzales filed this lawsuit on January 14, 2015.  (Doc. 1.)  He is suing Douglas under 42 U.S.C. § 1983 for use of excessive force in violation of the Fourth Amendment.  (Doc. 48.)

In February 2016, Douglas moved for summary judgment based on qualified immunity, claiming his actions were not clearly unreasonable under then-existing law.  (Doc. 72.)  In March 2016, Douglas also moved to strike expert opinions offered by Gonzales.  (Doc. 83.)

In April 2016, Gonzales responded to both motions. (Docs. 86, 89.) Attached to his response briefs were sworn affidavits of Gardner, the abovementioned eyewitness, dated October 15, 2015 and February 17, 2016. (Doc. 86-2 at 53–57; Doc. 89-1 at 4–9.)

In reply, Douglas moved to exclude Gardner's affidavits on the ground that they had not been disclosed during discovery. (Doc. 92 at 2–6; Doc. 98 at 1 n.2.) Because summary judgment might depend on the admissibility of Gardner's affidavits, the Court invited memoranda and briefing on whether Gonzales failed to properly disclose Gardner's affidavits. (Docs. 100, 103.) The parties explain the situation as follows.

On February 27, 2015, Gonzales served an initial disclosure which did not list Gardner as a potential witness. On March 4, Douglas served a request for documents and a set of interrogatories. Among the documents requested were "[d]ocumentation or other tangible evidence regarding investigation of the incident in question, or of parties or witnesses to this action," including "[w]itness statements." (Doc. 92-1 at 7.) Similarly, one of the interrogatories asked for "any and all exhibits, depositions, documents, writings, recordings, and any tangible evidence that you may or intend to utilize at the time of trial." (*Id.* at 22.) Gonzales responded on April 13. His response did not include any information beyond his initial disclosure, but he promised to "supplement" his response during discovery. (*Id.* at 8, 22.)

On June 23, 2015, Gonzales served a supplemental disclosure identifying Gardner as a person "present at the Hanesford Residence when the Scottsdale Police Department executed its search warrant." (Doc. 106-1 at 12.) The supplemental disclosure specified that Gardner will "testify as to his recollection of the events" that night. (*Id.*) Sometime around August 3, Gonzales's counsel revealed to Douglas's counsel that one of the witnesses was with Gonzales outside the house that night and will testify that the second flash bang injured Gonzales. On August 10, Douglas asked Gonzales to amend his disclosure to specify which witness will so testify, so that the witness may be deposed. (*Id.* at 35.)

On August 12, 2015, Gonzales served a second supplemental disclosure specifying that Gardner will testify about the flash bangs:

> Mr. Gardner is further expected to testify about the flashbang grenades deployed by SWAT on the eastside of the residence, where he was when he heard or witnessed such grenades detonating at the residence, and to the timing and sequence of events on January 16, 2014.

(*Id.* at 46–47.)  On August 18, Douglas scheduled a deposition of Gardner for August 26. (*Id.* at 64.)   That same day, Douglas's private investigator interviewed Gardner and recorded his statement.  (Doc. 104 at 7–10; *see* Doc. 106-1 at 100, ¶¶ 35–37.)   Douglas has not given a copy of this recording to Gonzales or the Court, citing "work product protection in order to preserve the interview material for impeachment of Gardner at trial."   (Doc. 104 at 7.)    Nevertheless, Douglas maintains that the statement is "inconsistent," contradicts "the overall record," and "differs significantly from the affidavits later disclosed."  (*Id.* at 7–9.)  On August 21, Gonzales was deposed.  Gonzales testified that Gardner visited him in the hospital after his injury and asked him what happened and where he went that night.  (Doc. 104-1 at 24.)  On August 24, Douglas cancelled Gardner's deposition without explanation.  (Doc. 106-1 at 73.)  Douglas's current explanation is that, due to the fact that Gardner asked Gonzales what happened that night and the inconsistencies and inaccuracies in Gardner's statement to the investigator, Douglas believed that Gardner "could not have seen anything that happened to" Gonzales.  (Doc. 104 at 11.)

On August 14, 2015, Douglas served a second set of interrogatories.  One of the interrogatories asked for "the entire factual basis" for Gonzales's assertion that Douglas's flash bang caused the injury.  (Doc. 104-1 at 30.)  Gonzales responded on September 25.[3] His response explained Gardner's expected testimony about the flash bangs:

---

[3] Douglas allowed Gonzales to extend the response deadline from September 18 to September 25.  (Doc. 104 at 12 n.2.)

1
2
3
4
5
6
7
8

> Colton Gardner is expected to testify to standing outside of the door on the east side of the residence next to Mark Gonzales when the first flashbang detonated.  Mr. Gonzales and Mr. Gardner will testify that, soon after the first flash-bang detonated on the east side of the residence, they observed a shadow like figure flying through the air, in excess of 15 feet, in their direction, and subsequently strike Mr. Gonzales in the left leg. . . . Officer Mullins acknowledged having thrown the first grenade; Mr. Gardner will testify that Mark Gonzales was struck by the second grenade thrown on the east side of the residence.

9
10
11
12
13
14
15
16

(*Id.* at 42–43.)  Douglas received this response on September 28.  By that time it was too late to depose Gardner, as the Court had set a fact discovery deadline of September 30 and the parties were not allowed to start depositions in the week prior to that deadline. (Doc. 20 at 2.)  However, the parties could have asked for an extension.  For example, on September 28 the parties asked the Court to extend the deadline for settlement talks, and the Court did so.  (Docs. 49, 50.)  Likewise, on October 27 Gonzales asked the Court to extend the deadline for expert disclosures, and the Court did so.  (Docs. 56, 57, 58, 60.) Douglas did not ask for an extension to depose Gardner.

17
18
19
20
21

Douglas now claims that Gonzales "knowingly withheld information and documentation which was subject to disclosure" under Federal Rules of Civil Procedure 26(a) and 26(e).  (Doc. 109 at 8.)  As a result, Douglas says he "has been incurably prejudiced in the preparation and presentation of [his] case, and the testimony should be stricken" under Rule 37(c)(1).  (*Id.*)  Oral argument was held on August 29, 2016.

22
23

## II.    MOTION TO EXCLUDE EYEWITNESS AFFIDAVITS

24
25
26
27
28

Under Rule 26(a), Gonzales had an initial duty to disclose (i) "each individual likely to have discoverable information—along with the subjects of that information— that [he] may use to support [his] claims" and (ii) "all documents, electronically stored information, and tangible things that [he] has in [his] possession, custody, or control and may use to support [his] claims."   Fed. R. Civ. P. 26(a)(1)(A).   Under Rule 26(e),

- 11 -

Gonzales had a further duty to "supplement" any disclosure or response to a discovery request if "in some material respect the disclosure or response is incomplete" and the additional information "has not otherwise been made known to the other part[y] during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

Gonzales disclosed Gardner as a potential witness and adequately described his anticipated testimony. Although Gonzales did not list Gardner in his initial disclosure, he did so in his first supplemental disclosure. (Doc. 106-1 at 12.) When Douglas asked for more detail, Gonzales specified in his second supplemental disclosure that Gardner will testify "about the flashbang grenades deployed by SWAT on the eastside of the residence, where he was when he heard or witnesses such grenades detonating at the residence, and to the timing and sequence of events" that night. (*Id.* at 46–47.) Douglas argues that this description was not specific enough. (Doc. 109 at 3.) But Rule 26(a) requires only a description of the general "subjects" about which a witness may testify, not details. *See* Fed. R. Civ. P. 26(a)'s advisory committee's note to 1993 amendment ("Indicating briefly the general topics on which such persons have information should not be burdensome, and will assist other parties in deciding which depositions will actually be needed.").

Gonzales's disclosure obligations did not require him to produce Gardner's affidavits. *Intel Corp. v. VIA Techs., Inc.*, 204 F.R.D. 450, 451–52 (N.D. Cal. 2001) (explaining why "the disclosure requirements of FRCP 26(a) and (e)" do not "require a party who has disclosed a potential witness also to reveal a declaration signed by the witness for use on an impending summary-judgment motion").

Nor did Gonzales's obligation to supplement his responses to discovery requests require him to produce Gardner's affidavits. As an initial matter, it is not clear that Douglas's requests for "tangible evidence" (Doc. 92-1 at 7, 22) applied to Gardner's affidavits at all. *See United States v. $307,970.00 in U.S. Currency*, 156 F. Supp. 3d 708, 724 (E.D.N.C. 2016) ("[A]lthough a declaration is tangible, it is not a 'document' within

the spirit of the rule.").  But even if Douglas's requests did apply to Gardner's affidavits, the information in those affidavits had "otherwise been made known" to Douglas within the meaning of Rule 26(e).  After Gonzales specified that Gardner had information about the flash bangs, Douglas's investigator interviewed Gardner, and Douglas scheduled a deposition for the following week.  Thus, Douglas had full access to the witness whose affidavits he seeks to exclude.  Gonzales fulfilled any obligation to supplement.

Douglas claims that he cancelled Gardner's deposition for two reasons.  First, he says that Gardner's interview revealed a dearth of reliable, relevant information.  The Court cannot fully evaluate this claim because Douglas has not produced the recording of the interview.  But even Douglas's own characterization of the interview undercuts his claim.  Douglas admits that in the interview, Gardner "claimed to have witnessed three flash bangs thrown outside the east side of the residence."  (Doc. 104 at 8.)  Douglas also admits that Gardner "stated that the first flash bang exploded behind him where he believed Gonzales to be standing next to the car [and] that Gardner then turned around 'maybe two seconds later' to see a second flash bang 'blow up' next to Gonzales."  (*Id.* at 8–9 (citations omitted).)  Those statements are clearly relevant and generally consistent with Gardner's affidavits.  Douglas cannot claim to have been surprised by Gardner's affidavits, nor can he blame anyone else for his own decision to cancel Gardner's deposition.  Douglas also says that Gonzales's deposition testimony revealed a lack of information on Gardner's part.  But that misconstrues Gonzales's testimony.  Gonzales testified that Gardner visited him in the hospital and asked him what happened and where he went on the night of his injury.  (Doc. 104-1 at 24.)  Those questions are consistent with Gardner's affidavits, in which Gardner recalls seeing Gonzales get struck by a flash bang but does not recall where Gonzales went afterward.  (Doc. 89-1 at 6, ¶¶ 12–17.)  Again, Douglas was not blindsided by the affidavits.

Near the end of fact discovery, Gonzales specified, in no uncertain terms, that Gardner "will testify that Mark Gonzales was struck by the second grenade thrown on the

east side of the residence." (Doc. 104-1 at 43.) Upon receiving this notice on September 28, 2015, Douglas did not ask the Court for an extension of time in which to depose Gardner—even though on that very day he asked the Court for an extension of the settlement talks deadline, which the Court granted. (Docs. 49, 50.) Rather, Douglas waited seven months to broach the subject, and when he did, he asked the Court to strike Gardner's affidavits entirely. (Doc. 92 at 2–6; Doc. 98 at 1 n.2.) He reasoned that the "bells cannot be un-rung at this point, even if the Court were to re-open discovery and extend other deadlines." (Doc. 92 at 5.) Douglas had multiple opportunities to prevent the bells from ringing in the first place. Thus, even if there were a discovery violation here, the solution would not be exclusion under Rule 37(c)(1). *See Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 783 (6th Cir. 2003) (failures to disclose seemed "relatively harmless" where opposing counsel "knew who was going to testify and to what they were going to testify" and "waited for five months to voice an objection"). Douglas's motion to exclude will be denied.

Apart from Rule 37(c)(1), however, the Court may modify the case schedule for good cause. Fed. R. Civ. P. 16(b)(4). Modification may include reopening discovery for a limited purpose. *Trask v. Olin Corp.*, 298 F.R.D. 244, 267–70 (W.D. Pa. 2014); *Watt v. All Clear Bus. Sols., LLC*, 840 F. Supp. 2d 324, 326–27 (D.D.C. 2012). What constitutes good cause "necessarily varies with the circumstances of the case." 6A Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 1522.2 (3d ed., Apr. 2016 update). Although Douglas has not shown a discovery violation, he was otherwise diligent in obtaining evidence during discovery. Therefore, in the Court's discretion, Douglas will be given 30 days in which to depose Gardner even though discovery is otherwise closed. Allowing this deposition will not prejudice Gonzales, produce undue delay, or affect any other deadlines including the lapsed deadline for filing dispositive motions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Douglas's other objections based on discovery violations (*see* Doc. 92 at 2) have either been withdrawn (Doc. 109 at 11) or refuted (Doc. 105 at 8–9).

## III.   MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY

Douglas's motion for summary judgment is independent of his motion to exclude Gardner's affidavits.  Douglas argues that, even if the affidavits are not excluded, they do not prevent the Court from granting summary judgment on the basis of qualified immunity.  (Doc. 98 at 2.)

### A.   Qualified immunity

Under 42 U.S.C. § 1983, government officials sued in their individual capacities may assert the affirmative defense of qualified immunity, which generally protects them from civil damages for performance of discretionary duties.  *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009); *Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002).  The doctrine protects an official who "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

A law enforcement officer is entitled to qualified immunity as long as he does not violate a statutory or constitutional right that is "clearly established in light of the specific context of the case" at hand.  *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc).  A right is clearly established if, at the time of violation, "every reasonable official" would understand that "what he is doing violates that right." *Id.* at 442 (quoting *al-Kidd*, 563 U.S. at 741).  There need not be "a case directly on point," but "existing

precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *al-Kidd*, 563 U.S. at 741).

On the evening Douglas threw a flash bang, Ninth Circuit precedent governing flash bangs consisted of one case: *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004).[4] In *Boyd*, police had a warrant to search an apartment for jewelry and a handgun that had been stolen in an armed robbery. *Id.* at 776–77. The police had information that (1) one of the robbers could be in the apartment, (2) the stolen handgun could be in the apartment, (3) someone connected with the apartment had recently tried to buy an assault rifle, (4) two armed individuals had recently left the apartment, (5) the apartment had a loft from which someone inside could shoot at police, and (6) five to eight people could be sleeping in the apartment. *Id.* at 777. The police executed the warrant in the early morning. *Id.* After announcing police presence, an officer reached inside the door of the dark apartment and, without looking, tossed a flash bang near the front wall. *Id.* As it turns out, someone was sleeping on the floor and suffered burns. *Id.* at 777–78. The court held that the officer violated the Fourth Amendment "in using a flash-bang inside a dark apartment where five to eight people might be sleeping." *Id.* at 784.

The Ninth Circuit's conclusion in *Boyd* is consistent with case law in other circuits. The Second Circuit surveyed this law and summarized the relevant legal principles. *Terebesi v. Torreso*, 764 F.3d 217, 236–39 (2d Cir. 2014). In evaluating the use of a flash bang, it is "important to determine whether the officer[] first confirmed that [he was] tossing the stun grenade into an empty room or open space." *Id.* at 38. Also, use of a flash bang is more likely to be reasonable in cases where "the subject of the search or arrest is known to pose a high risk of violent confrontation," as opposed to "routine searches and seizures that do not pose a high risk of violent confrontation." *Id.*

---

[4] In another case, the Ninth Circuit offered inconclusive dictum on the use of flash bangs inside a house. *United States v. Ankeny*, 502 F.3d 829, 836–37 (9th Cir. 2007).

With these principles in mind, the Court turns to whether Douglas is entitled to qualified immunity as a matter of summary judgment.

### B.      Summary judgment

Summary judgment is proper where there is no "genuine dispute" about a "material fact."  Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The movant has the burden of showing the absence of any genuine dispute of material fact.  *Id.* at 256.  If that burden is met, the nonmovant must set forth "specific facts showing that there is a genuine issue for trial."  *Id.*  In deciding a motion for summary judgment, the Court must not weigh evidence or make credibility determinations, and must draw all justifiable inferences in the nonmovant's favor.  *Id.* at 255.

Gardner's testimony supports an inference that Douglas knowingly or recklessly threw a flash bang at Gonzales.  According to Gardner, Gonzales exited the house well before any flash bang detonated.  Once outside, Gardner heard an explosion behind him and then, seconds later, saw a "second explosion occur in the area of where [Gonzales] was standing."  (Doc. 89-1 at 6, ¶ 12.)  Gardner specifically recalls that Gonzales "was standing somewhere between the driver's door of the car and the door to the house."  (*Id.*)  Douglas, the officer who threw the second flash bang, insists that he had a clear view of the backyard.  (Doc. 73-13 at 21–22, 26.)  A photograph of Gonzales' injury confirms that a flash bang detonated near his leg, causing serious burns.  (Doc. 90 at 47–48.)  A reasonable juror could infer from this evidence that Douglas either aimed a flash bang at Gonzales or threw it in his direction without looking and seeing that he was already there.

The possibility of that inference forecloses summary judgment on grounds of qualified immunity.  In *Boyd*, the Ninth Circuit deemed the throwing of a flash bang unreasonable even though the officer (1) did not see whether anyone was in the flash

bang's path and (2) faced a risk of violence because the subject of the search had recently committed armed robbery. 374 F.3d at 776–79. Here, viewing the evidence in the light most favorable to Gonzales, Douglas's throwing of a flash bang was no more reasonable than the conduct in *Boyd*. One could infer from Gardner's testimony that Douglas saw or should have seen Gonzales in the flash bang's path, and there is no evidence that Douglas faced a risk of confronting anyone with a criminal history as violent as armed robbery. On that view of the facts, Douglas's use of the flash bang violated Gonzales's clearly established Fourth Amendment rights. *See Taylor v. City of Middletown*, 436 F. Supp. 2d 377, 386–87 (D. Conn. 2006) ("The court cannot conceive of a set of circumstances that would permit an officer, contrary to the intended use of the device, to throw a flash-bang device directly at a person. In any event, such circumstances certainly do not exist in this case . . . ."). Douglas tries to distinguish *Boyd* on the ground that it involved a flash bang in a building, not in a backyard. "However, a victim's constitutional rights may be clearly established in the absence of a case 'on all fours prohibiting [the] particular manifestation of unconstitutional conduct [at issue].'" *Boyd*, 374 F.3d at 781 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001)). An indoors-outdoors distinction does not matter here, where there is evidence suggesting Douglas threw his flash bang where he saw or should have seen Gonzales. Summary judgment must be denied.

Douglas points out that Gardner's account of events is contradicted by other evidence in the record. For example, Gardner testifies that he did not clearly see or hear police until the first flash bang exploded, whereas police presence would have been apparent because the police drove to the house in loud armored cars and the lead officer yelled "Compromise!" as they approached. (*See* Doc. 98 at 5–7.) In addition, Gardner testifies that the second flash bang detonated near the east side door of the house, whereas Douglas claims that he threw his flash bang north of that area and offers a photograph of the debris from the flash bang to support his claim. (*See id.* at 7–9.) Most significantly,

Gardner's testimony contradicts Gonzales's own testimony.  According to Gardner, (1) Gonzales walked out of the house with Gardner to get a better view of the street, (2) forty-five seconds later, the first flash bang detonated somewhere nearby, and (3) ten seconds later, the second flash bang detonated near where Gonzales was standing.  (Doc. 89-1 at 5–6.)  But Gonzales says that (1) he raced out of the house in fear for his life, (2) a few seconds later, a flash bang detonated near his leg, and (3) then he jumped the backyard wall, without ever hearing a second flash bang.  (Doc. 74-13 at 48–54.)

Despite these discrepancies, a reasonable juror could credit Gardner's testimony. Although the police made noise as they approached the house, Gardner might not have known that they were police until they identified themselves.  Although Douglas claims that he threw his flash bang in the area north of where Gonzales was injured, he does not have any independent memory of the event (*see* Doc. 73-13 at 25–27) and the purported photograph of the debris from his flash bang (*see* Doc. 99-1 at 33) lacks foundation and shows, at most, that someone threw a flash bang in that area at some point.  Although Gonzales recalls being struck by the first flash bang immediately after he ran out of the house, he repeatedly describes his memory as "fuzzy" (*see* Doc. 74-13 at 48–49), as might be expected from someone who suffered a traumatic injury after having smoked marijuana.  For better or worse, Gardner is the only person without a direct interest in the outcome of this case who claims to have witnessed the moment of Gonzales's injury. Although the jury may not believe his testimony at trial, the Court cannot assess credibility at summary judgment.

In the absence of Gardner's testimony, summary judgment may well be appropriate.  There does not seem to be any other evidence refuting Douglas's claim that he looked and did not see anyone in the area where he threw his flash bang.  Douglas was not required, under clearly established law, to predict that Gonzales might race out of the house and into the explosion.  While *Boyd* generally forbids an officer from blindly throwing a flash bang into an enclosed area where innocent bystanders are likely to

reside, *see* 374 F.3d at 779, it does not clearly forbid an officer from throwing a flash bang during a high-risk search into an empty area, even if there is a chance that an unseen person will run into that area as the flash bang detonates.  However, the Court does not decide how to rule in the absence of Gardner's testimony, because Gardner's testimony raises a genuine issue of material fact preventing summary judgment.

## IV.    MOTION TO STRIKE EXPERT OPINIONS

Expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  W. Ken Katsaris is a former police officer who teaches other officers how to assess and resolve safety threats.  On behalf of Gonzales, he submitted several opinions.  (Doc. 83-1 at 3–10.)  His opinions are arranged into four parts.  (*Id.* at 6–9.)  Gonzales helpfully summarizes the opinions as follows:

> [1] The Scottsdale Police Department exaggerated the threat to officers at the location of the search.

> [2] Defendant Douglas did not have a visual observation of the target area before throwing the flash bang grenade.

> [3] Defendant Douglas used the flash bang not to "surprise" the occupants of the home being searched, but to contain them, an improper use of the flash bang, and

> [4] [Katsaris] criticized the entire execution of the search, concluding that the use of the [armored vehicle] to enter, and deployment of at least five flash bangs, was unreasonable.

(Doc. 86 at 2.)

None of these opinions is admissible.  First, whether the Scottsdale Police Department exaggerated the threat to officer safety prior to the search is irrelevant.  Douglas is the only defendant in this case, and there is no evidence that he exaggerated any threat.  The substantive question in this lawsuit is whether Douglas acted reasonably, and that question must be "judged from the perspective of a reasonable officer on the scene."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  In other words, the relevant threat is what Douglas reasonably thought it was, not what it actually was.  Katsaris's opinion

as to the actual threat level "is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993).   Even if the actual threat level were relevant, the jury is perfectly capable of inferring threat from the circumstances of this case, so Katsaris's opinion is doubly unhelpful.  *See* 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6265.2 (2d ed., Apr. 2016 update) ("[E]xpert testimony does not help where the jury has no need for an opinion because the jury can easily reach reliable conclusions based on common sense, common experience, the jury's own perceptions, or simple logic.").

Second, whether Douglas looked before he threw the flash bang is a factual dispute for the jury to decide.  Witnesses differ on this point.  Douglas insists that he looked; Gardner suggests otherwise.  Katsaris credits Gardner and ignores Douglas.  But expert opinion "does not help if it simply assumes crucial facts that are in dispute." 29 Wright & Gold, Federal Practice and Procedure § 6265.2.   The job of assessing credibility "is for the jury—the jury is the lie detector in the courtroom."  *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973).  Katsaris's qualifications do not give him special insight into Douglas's truthfulness or what he saw that night.

Third, what Douglas intended to accomplish by throwing the flash bang is irrelevant.  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  *Graham*, 490 U.S. at 397.  Even if Douglas's intent were relevant, the question of intent would be a factual dispute for the jury, outside the scope of Katsaris's expertise.   To the extent that Katsaris's opinion explains the purpose of flash bangs, it is unnecessary because the parties have already provided ample evidence on that point.  (Doc. 73, ¶¶ 55–72; Doc. 90 at 21–26.)  To the extent that Katsaris's opinion condemns Douglas's use of the flash bang as unreasonable, it is an unhelpful "legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008)

(quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)) (emphasis omitted).

Fourth, the reasonableness of the "entirety" of the search is irrelevant. In this lawsuit, Gonzales is the only plaintiff and Douglas is the only defendant. The planning officer's decision to use an armored vehicle is not at issue. Other officers' decisions to throw flash bangs are not at issue. At issue is whether Douglas's use of a flash bang was reasonable. Instead of opining on a subsidiary matter within his expertise to aid the jury in deciding that issue, Katsaris decides the issue directly. (Doc. 83-1 at 8 ("This [flash bang] deployment became a 'high' level of force, and was an excessive use of force by Douglas. It is my opinion that Douglas' deployment of the [flash bang] was simply unreasonable, and any similarly situated officer would have known to NOT deploy the device . . . ."). In so doing, he abandons his role as expert and invades the province of the jury. *See Nationwide*, 523 F.3d at 1058.

Thus, Douglas's motion to strike Katsaris's opinions will be granted. This is not to say that Katsaris is unqualified to offer any opinion in this case. For example, if the parties disagree on the intended purpose or customary use of flash bangs, Katsaris's opinion on the matter may prove helpful to the jury, and Gonzales may ask the Court to allow such an opinion. But Katsaris's current opinions extend well beyond the range of testimony contemplated by Rule 702.

IT IS THEREFORE ORDERED that Defendant's motion to exclude evidence based on discovery violations (Doc. 92 at 2–6; Doc. 98 at 1 n.2) is denied.

IT IS FURTHER ORDERED that discovery is reopened until September 30, 2016 for the sole purpose of deposing Colton Gardner.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment (Doc. 72) is denied.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IT IS FURTHER ORDERED that Defendant's motion to strike opinions of Plaintiff's expert W. Ken Katsaris (Doc. 83) is granted.

IT IS FURTHER ORDERED that the parties shall lodge a Joint Proposed Pretrial Order by October 21, 2016.

Dated this 30th day of August, 2016.

_____
Neil V. Wake
Senior United States District
Judge